JOHN RODNEY, Admr. d. b. n. of Luke Shields, deceased,

*vs.*

WILLIAM SHANKLAND, Ex'r. of Mary Neill, deceased, who was Ex'x. of Henry Neill, dec'd., and Elizabeth Wright and Fretwell Wright, Ex'rs. of Peter F. Wright, dec'd, and Daniel Rodney, admr. of Henry Fisher deceased.

*Sussex, July T.* 1818.

A person for whose benefit a trust is created may, in equity, compel the performance of it, although he be no party to the contract which created it.

Pending execution against the debtor under several judgments, it was agreed in writing, between N. the first judgment creditor and those holding judgments subsequent to the second, that H. N. should be

allowed to purchase, at sheriff's sale, a portion of the debtor's real estate, without "let or hindrance" by the subsequent creditors; and that in consideration thereof, he would hold the other lands of the debtor discharged from his judgment, and would pay the second judgment. Held that H. N. became a trustee for the second judgment creditor, and that the latter, although not a party to the agreement, had a remedy under it in equity.

BILL IN EQUITY FOR THE EXECUTION OF A TRUST —John Little deceased being indebted to several persons, judgments were recovered against him at law, and after his decease other judgments were recovered against his executor, Nicholas Little, in the years 1785, 1786 and 1787. First, was a judgment recovered by Henry Neill, in the Court of Common Pleas, for Sussex County, in November 1785, for £484. 15. 4½. Next, was a judgment recovered by the administrators of Luke Shields, deceased, the complainant's intestate, in the Court of Common Pleas, in February 1785, for £100. Following these two judgments were two others, recovered in the Supreme Court, in February 1787, one by Thomas and S. R. Fisher, and the other by Jeremiah Warder & Co. Executions were issued upon the respective judgments of Neill and the administrators of Shields, and were levied upon the real estate of Henry Little deceased. Pending these executions an agreement in writing, under seal, dated February 10th 1787, was entered into between Thomas and S. R. Fisher, Jeremiah Warder & Co., by their attorney Henry Neill, and Nicholas Little, executor of John Little deceased, in the words following, viz;

" Whereas, judgments have this day been confessed in two causes depending in the Supreme Court for the County of Sussex, in one of which Thomas Fisher and Samuel R. Fisher are the plaintiffs, and Nicholas Little, executor of John Little, is defendant; in the other of which Jeremiah Warder and Company are plaintiffs, and the said Nicholas Little is also defendant; Now, it is agreed by all the parties plaintiffs, and the said Nicholas Little, the defendant, as

aforesaid, that the said jugments are confessed on the following terms to wit; that whereas Col. Henry Neill, party hereto, did some time past also recover judgment against the said Nicholas Little, executor as aforesaid, and issue a *Fieri Facias* thereon; that the said Henry Neill shall be permitted to purchase, of the land of the aforesaid John Little, deceased, five hundred acres, to include the improvements whereon the said John Little lived, and where the said Nicholas now lives, and as much land adjoining the same as, in the whole, makes up the quantity of five hundred acres of land and no more, so that the same lie in one body and be part of the land on which the said Henry laid his execution on the judgment so as aforesaid obtained by him against the said Nicholas, and also fifty acres of land sold by the said Nicholas to Walter Hudson, without any let or hindrance from the said plaintiffs, their, or either of their agents, at the vendues to be advertised by the Sheriff of Sussex County on the executions to be issued on the judgments aforesaid, or any of them: the said Henry, in consideration thereof, hereby covenanting and agreeing fully and absolutely to discharge, and hereby release and quit claim, all and every part of the residue of the real and personal estate of the said John Little, or of the said Nicholas Little; and further, that the said Henry shall pay, or cause to be paid, to the representatives of Luke Shields, late of the County of Sussex aforesaid, the sum of money mentioned in the judgment obtained by them against the said Nicholas, executor of the said John, with the costs of the said suit. And also, whereas the said Nicholas, after the death of his father, the said John Little, did illegally contract with a certain Andrew Simpler for the sale of about one hundred acres, be the same more or less, according to the neat quantity hereafter to be ascertained, the said Henry doth hereby also promise, grant, and agree to and with the said plaintiffs, that he will well and truly pay to them such value, and so much, for the same as Peter Fretwell Wright,

James Martin, and Peter Robinson, or any two of them, shall, under their hands, adjudge the same to be worth. But if the aforesaid plaintiffs, or any of them, shall disagree to the terms hereinbefore mentioned, the said two judgments are to be void and of no effect, and the said suits to be continued as if no such judgments had been entered ; *provided,* that in case any of the parties should disagree as aforesaid, such entry shall occasion no delay in the trials thereof. In witness whereof, the said parties and their agents have to these presents set their hands severally, the tenth day of February in the year of our Lord, one thousand seven hundred and eighty seven."

The agreement was signed and sealed by the respective parties.

Pursuant to the above agreement the execution of Neill was proceeded in, and he purchased at Sheriff's sale the five hundred acres of land mentioned in the agreement, for the consideration of £620, without any let or hindrance from the other parties. He also purchased, at the same sale, another tract of 95 acres for £71. Deeds were duly made to Neill for the premises so purchased. After the sale, and on the day of the execution of the first of the Sheriff's deeds, to wit, September 5, 1787, Neill gave to Peter F. Wright, the Sheriff, a writing, acknowledging himself to be indebted to Wright in £71. 2. 4½, in the words following, viz :

" I, Henry Neill, of Sussex County, in the Delaware State, do hereby acknowledge myself indebted to Peter F. Wright, Sheriff of Sussex County, in the sum of £71. 2. 4½, in current, lawful money of the Delaware State : it being the balance remaining due to him for the purchase money of a tract of land purchased by me, as the property of John Little, deceased, late of Sussex County. Witness my hand the 5th day of September, 1787."

( Signed) HENRY NEILL.

Witnesses present.
WILLIAM PEERY,
JAMES MONROE.

The sum specified in this writing (£71. 2. 4½) was the balance of the purchase money after deducting the amount due on Neill's judgment against Henry Little, deceased, and the costs. Subsequently, all the other lands of Little were sold under execution.

In May 1792, the administrators of Luke Shields, deceased, brought their action, in the Court of Common Pleas for Sussex County, against the executors of Peter F. Wright, deceased, late sheriff, to recover the amount of the Shields' judgment, as having been made by him out of the sales of the real estate. Pending this action, on the 17th of April 1797, an agreement was entered into and filed in the suit, between Luke Shields, the surviving administrator of Luke Shields, deceased, Fretwell M. Wright, one of the executors of P. F. Wright, deceased, and Henry Neill, as follows, viz :

LUKE SHIELDS' ADMINISTRATORS, ⎫
        *vs.*                                          ⎬
PETER F. WRIGHT'S EXECUTORS. ⎭

"Whereas Luke Shields' administrators obtained a judgment against Nicholas Little, executor of John Little deceased, and issued execution, which was levied upon certain lands, &c., which were afterwards sold by the defendant's testator as sheriff, and were bidden off and bought by Henry Neill, who became by agreement with certain judgment creditors of the said Little, and with the said then sheriff, by a note of hand, &c., liable *for the said plaintiff's share of the money arising upon the said sales of the said land ;* Now, it is agreed by the parties to this suit and by the said Henry Neill, that the said debt shall be ascertained by William Peery, Esquire, and John Russel, Esquire, and if the said two referees cannot agree, they are to choose a third person, the report of any two of whom to be binding. *Ex parte,* rule on four days' notice. Signed this 17th day of April, A. D. 1797."

(Signed,)                      LUKE SHIELDS,
                                        HENRY NEILL,
                                        FRETWELL WRIGHT.

Nothing was done under this reference thus agreed upon until Feb. T. 1809, when Peery, one of the referees, being dead, three new referees were agreed upon in writing filed in the suit. These referees afterwards met, and in Nov. 1816, made a report awarding a balance of $802.06 as due to Shields' administrators; but this award was set aside for an informality, and no further proceeding was had at law. It appears that Peter F. Wright, the sheriff, by whom Little's real estate had been sold, being under the impression that Henry Neill was bound under the agreement first above stated for the whole of the Shields judgment, had suffered the balance of the proceeds to go into the hands of the subsequent judgment creditors, Thos. and S. R. Fisher and Warder & Co. Luke Shields' administrators were not parties to the agreement and knew nothing of it until its existence was disclosed, pending their action against the sheriff's executors. Under these circumstances, they abandoned the action at law, and filed this bill in equity for a discovery and for a decree charging Neill as trustee of the lands purchased by him to the amount due on their judgment, pursuant to his agreement with the subsequent judgment creditors and with John Little's executor.

The defence taken by the answer of Henry Neill's executor was, that it was the true object and construction of the agreement, that Neill should purchase the land agreed for, and, after paying his judgment, should apply the balance to that of Shields, it being then not doubted that the land would be bid up to a figure sufficient to cover both these judgments; that an agreement to apply to the Shields judgment more than the balance of the purchase money would have been without consideration; that Shields' administrators were not joined in the agreement, for the reason that they were to be left free to collect any deficiency upon their judgment after applying the balance of purchase money; and that in accordance with this view of the arrangement, Neill had, on receiving his deed, given to

the sheriff his note for the balance of the purchase money, the £71. 2. 4½.

Henry Fisher, whose administrator, d. b. n.,was made a party defendant in this cause, was one of the original administrators of John Little, deceased.    The executor of Neill claimed as credits against the Shields judgment some payments which had been made by Neill to Henry Fisher, he being then, one of the administrators of Luke Shields, which payments were on the contrary claimed to have been made upon private accounts between Neill and Fisher. Hence, the joining of Fisher's administrator, d. b. n., in this suit.    Answers were filed by all the defendants, but only that of Henry Neill's executor, before set forth, is material to the questions decided.    Issues were joined and depositions taken by both parties.

Some objections were made to the bill for the want of proper parties, which the Chancellor overruled.    They are not deemed of sufficient importance to be reported.

The cause came before the Chancellor on the 24th July, 1818, for a hearing upon the bill, answers, exhibits and depositions.    The case turned upon two questions, viz :

1st. Whether, by the agreement of February 10, 1787, Henry Neill became bound to pay the whole judgment of Shields' administrators ? and

2d. If he did, whether the administrators, not being parties to the agreement, the complainant had any remedy under it against Neill's administrator ?  The present report of the case is made only with a view to the latter question.

*Robinson*, for the complainant.

The administrators of Shields, not being parties to the agreement, and having no remedy under it at law, may sue here.  3 *Levinz*, 138, shows that they could not sue at

law.   They are relievable here, on the ground of a trust attaching to the land in Neill's hands under the agreement.   1 *P. Wms.* 211, 222 : *Equity Cas. Abr.* 739 *A. p.* 4. With respect to the question of consideration, Neill obtained by the agreement an advantage in purchasing the land free from the competition of the other creditors.

*Wells,* for Neill's executor.

There is no consideration to Neill under this agreement.   His judgment was secure in all events, being the first lien on all of Little's real estate.   1 *T. R.*, 350, *note (a) Rann, Exr. &c., vs. Hughes.*   No consideration appears here except what arises out of the formality of the instrument, it being under seal.   Further, Neill never agreed to pay the whole of Shields' debt.   The note given by him to the sheriff (for £72. 2. 4½) corresponds with the balance of the purchase money, and shows that Neill's liability was limited to this balance.   But again, there was no privity between Neill and the administrators of Shields.   They are strangers to the contract.   They paid no consideration and have no interest in it.   Their interest is in the balance of the money arising from the sales, after satisfying Neill's judgment, and their remedy is against the sheriff's executors.

RIDGELY, CHANCELLOR—upon examination, at some length, of the agreement of February 10, 1787, concluded that Neill was bound by it to pay the whole debt of Shields ; and proceeding to consider whether the administrators had, in equity, any remedy under the agreement against Neill's executor, the Chancellor said :

The defendant, Shankland, contends that the administrator of Shields, and that Wright, the sheriff, were not parties to the agreement of 10th of February 1787; and, therefore, that there is no privity between the com-

plainant and the defendant; and, consequently, that the complainant cannot prosecute this suit on the said agree- ment against Neill's representative; that if the complain ant had any cause of action, it was against Wright, the sheriff, and his executors, for the money levied under the *Venditioni Exponas,* upon which the land was sold; and that his remedy was at law, both according to the rules of the common law, and the provision of the Act of the General Assembly entitled " An act for establishing Courts of Law and Equity within this Government."*

That Shields' representatives had a remedy at law against the sheriff for the balance of the sales of the land of John Little, after the payment of Neill's judgment, is too plain a proposition to be denied. Neill had recovered the first judgment, Shields' administrators the second; and consequently after the payment of Neill, the whole real estate of John Little was bound for this judgment of Shields' administrators. And at law, the Sheriff was lia- ble for having applied any part of the purchase money arising from Little's real estate to the Messrs. Fisher or to Warden, in preference to Shields' administrators; but it would be monstrous in a court of equity to allow Neill to make such a defence in violation of his agreement of February 1787; and that too, after he has received the full benefit of that agreement. What would be the conse- quence? It would be this—Shields administrators must sue the sheriff; the sheriff must sue the Messrs. Fisher; and they must enforce at law the agreement of 1787 against Neill. Thus, a circuity of action must be produced, and justice could not be done. Such a course would be mani- festly unjust; because, as nothing could be recovered at law, more than the nominal sums given for the several parcels of the land, the full amount of Shields' judgment, which

---

*1st. Vol. Del. Laws, 132: Digest of 1829, p. 103, sec. 25, passed between 1726 and 1736. This act expressly prohibits the old Court of Com- mon Pleas, in which equity jurisdiction was then vested, from entertaining any matter for which there was remedy at common law.

Neill agreed to pay, and which was part of the consideration for the five hundred acres of land, would be fraudulently withheld by Neill. He would thus take advantage of his own wrong; and that too, after he had agreed to be purchaser and had substituted himself as paymaster for the full amount, instead of the sheriff, to Shields' administrators. Now, the true question is, whether Shields' administrators, not being parties to the agreement of 1787, can compel Neill, or his representative, to execute that agreement. At law, it is certain that they cannot, because they were not parties to the contract; and if equity will not afford a remedy, their case is hopeless.

In speaking of privity, it may be necessary to take a very slight view of Uses at Common Law, as connected with this subject. To the execution of a Use two things were absolutely necessary,—confidence in the person and privity of estate. All who came in, in privity of estate, *or with notice,* or without consideration, are bound by it. And in 1 *Co. Rep.* 122. *b.*, it is said that although a stranger purchased land from a feoffee to uses *for a valuable consideration,* yet *if he had notice* of the former uses, he would be compelled to execute them. According to 2 *Com. Dig. Title Chancery,* 627. (4. *c*); *Title Notice* (4. *c.* 1), notice of a trust makes a person privy; as, a person with notice of a trust, judgment, mortgage or other incumbrance, shall be affected by it. Sec. 1 *Eq. Ca. Ab.* 332: 2 *Com. Dig.* 627, 717.

Now, it is evident that Neill had complete notice of this judgment of Shield's administrators; that he engaged to pay it; that he purchased the land subject to this judgment : and that the advantage or convenience which he derived from being allowed to purchase as he did was a sufficient consideration in equity. The question then occurs, whether Shields' administrators have any remedy in equity. The counsel for the complainant cited the case of *Dutton vs. Dutton,* 2 *Eq. Ca. Ab.* 739. *p.* 4. There, D, having more than £3,000 per annum, married M, the

plaintiff, who had £10,000 portion, and settled £1,000 per annum upon her for her jointure ; and the greatest part of D's estate was settled upon the first and every other son in tail-male successively,as is usual in marriage settlements. D, ran greatly in debt, and J, his eldest son, being of full age, D, on calculating his debts and estate, agreed with J to convey all his estate to him, and J covenanted to pay all D's debts and allow him £500, per annum as a rent charge for his life ; and further (upon which the question arose) *that J should indemnify D from all his debts, and from the charges and expenses for the maintenance of the said M, she being then separated by consent.* M brought a bill against D and J, to have an allowance for her maintenance, &c., Lord Chancellor Cowper ordered M to be allowed £200 per annum. He said that by this covenant to indemnify D from maintaining M, his wife, J had taken upon himself the charge of maintaining her, and, as to this purpose, stands in D's place, who is bound to give his wife an allowance, if he voluntarily separates from her ; and he said that he took J in this case to be in the nature of a trustee for the wife, so far as a reasonable allowance for her maintenance was concerned.

It is not easy to distinguish, in principle, the difference between the right of the wife in this case of *Dutton vs. Dutton,* and the right of Shields' administrators to sue in equity. In both cases the covenantors made an engagement for the benefit of a person not a party to the covenant, and as they both received a sufficient consideration it is quite as reasonable that Neill should be considered in the nature of a trustee for Shields' administrators, so far as to pay the judgment, as that J should be a trustee for the maintenance of the wife. The counsel for the complainant cited also *Lechmere vs. Carlisle* 3 *P. Wms.* 211, to this effect, that every *cestui que trust,* whether a volunteer or not, or be the limitation under which he claims with or without a consideration, is entitled to the aid of a court of

equity, to avail himself of the benefit of a trust, (p. 222;) and that the forbearance of the trustees shall not prejudice him, (p. 215.) In these cases the principle seems to be fully established, that the person for whose benefit a trust is created may compel the performance, although he may be no party to the contract. It is to be observed that Shields' administrators were not mere volunteers. They had a lien, prior to Neill's engagement, on the land of John Little, which Neill, for his own accommodation, agreed to satisfy. I might refer to cases of marriage settlements,—*Osgood vs. Strode.* 2 *P. Wms.* 245 : *Vernon vs. Vernon*, 2 *P. Wms.* 594 : *Goring vs. Nash*, 3 *Atk.* 186,—where persons, not parties to the articles and from whom no consideration flowed, were permitted to enforce their specific execution. It is true, the principles of these cases do not strictly apply to this ; but they prove that equity will not compel a person to sue upon a covenant, in the name of trustees, when circuity of action may be prevented, and when equity can afford a more adequate remedy to the person for whose benefit the covenant was made, by his suing in his own name ; and that it is not an objection that the party claiming under a covenant is a volunteer, and that the consideration did not move from him, if the party making the articles had a sufficient consideration. In the Supreme Court of the United States, 5 *Cranch*, 322, *Riddle & Co.*, *vs. Mandeville and Jameson*, it was decided that equity will decree the payment to be *immediately* made by the person *ultimately* responsible, *to the person who is actually entitled to receive the money.* That was a suit brought in equity by the holder of a promissory note, to recover its amount against a remote endorser. In a suit between the same parties, that Court had previously determined that the plaintiff was without remedy at law. Although there were some particular circumstances in that case, yet the Court, in the opinion delivered by Chief Justice Marshall, laid down the law broadly, that equity will make that party *immediately* liable, who is *ultimately*

*liable at law.*  There, as well as in this case, the plaintiff
had no remedy at law.  This doctrine is confirmed in a
subsequent case in the same court, 7 *Cranch,* 69, *Russel vs.
Clark's Executors,* as well as the doctrine that notice of a trust
makes the person having such notice a trustee.  The latter
point is first mentioned by the Court (p. 97) thus; " it also
" appears, that in September 1796, Robert Murray & Co.,
" assigned to Loomis and Tillinghurst certain personalities
" in trust.  This assignment was surrendered to Clark
" (the plaintiff) and Nightingale (his deceased partner)
" in consideration of notes to a large amount, in which
" Loomis and Tillinghurst were bound for Robert Murray
" & Co.  It appears that Clark and Nightingale *are other-*
" *wise secured with respect to these notes.*  At least, there is
" reason to believe that they are secure.  Clark and Night-
" ingale having taken this assignment, with notice of the
" trust, take it clothed with the trust.  They are trustees
" for the same uses, and to the same extent with Loomis
" and Tillinghurst.  A paper appears in the cause which
" purports to be the assignment to Loomis and Tilling-
" hurst.  The assignment is in trust; first, to repay them-
" selves any sums which they may pay on account of cer-
" tain undertakings made by them for Robert Murray &
" Co.; and secondly, in trust to pay to Joseph and Wm.
" Russell, all such monies as they shall be liable to pay, as
" guaranty as aforesaid, to Nathaniel Russell upon bills,
" &c., reciting the bills for which this suit is instituted.
" It is settled in this court, that the person for whose ben-
" efit a trust is created, who is to be the ultimate receiver
" of the money, may sustain a suit in equity to have it
" paid directly to himself.  This trust being to pay Joseph
" and Wm. Russell a sum which they are liable to pay to
" Nathaniel Russell, and being created in such terms that
" the money is certainly payable to them, the purposes of
" equity will be best effected by decreeing it, in a case like
" the present, to be paid directly to Nathaniel Russell.

" Indeed, the court ought not to decree a payment to " Joseph and Wm. Russell without security that the debt " to Nathaniel Russell shall be satisfied."

This case pointedly supports the complainant in sustaining his suit to recover money directly to himself, of which he was to be the ultimate receiver. And it may be remarked that the plaintiff, Nathaniel Russell, was not a party to the assignment made to Loomis and Tillinghurst; neither was it a trust to pay *immediately* to him any money, but only " to pay to Joseph and Wm. Russell all such " monies as they shall be liable to pay as guaranty as " aforesaid to Nathaniel Russell (the complainant) upon " bills." There, the trust was for the indemnity of J. and W. Russell *on account of such monies as they shall be liable to pay to Nathaniel Russell.* But as the trust was ultimately for the benefit of Nathaniel Russell, although he was no direct party to the assignment (or deed of trust,) it was the opinion of the Court that the purposes of equity would be best effected by decreeing a payment of the money directly to him. In the case before us, Neill promises to make a direct payment to Shields' administrators; and on this agreement, I have no hesitation, upon the above authorities, and upon the reason and justice of the demand, to decree payment to Shields' administrators.

Afterwards the amount due on the judgment of Luke Shields' administrators against John Little's executor was ascertained, and a decree for its payment entered against the executor of Henry Neill, deceased.